UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

DONTIE S. MITCHELL, and those
similarly situated,

                    Plaintiffs,                    **DECISION and ORDER**
                                                   **No. 6:17-cv-06673(MAT)**
       -vs-

PAUL CHAPPIUS, JR., Superintendent;
J. HUGHES, Deputy Superintendent;
PARESO (aka "WATER BOY"), ARNOT,
FLINT, and SIMPSON, Correction
Officers, Elmira staff sued in
individual and/or official
capacities; STEWART ECKERT,
Superintendent; KEVIN J. BROWN,
Deputy Superintendent; B.J. GABEL,
Deputy Superintendent; T.
FRANCLEMONT, Assistant Deputy
Superintendent; MEYERS, Correction
Captain; SOWA, HERZICK, and LABEDZ,
Correction Lieutenants; WILKIN and
SZABLESKI, Senior Offender
Rehabilitation Coordinators; B.
RICHARDSON, Office Assistant;
ROBERT, Correction Sergeant, Wende
staff sued in individual and/or
official capacities,

                    Defendants.
_____

## I. Introduction

     Proceeding *pro se*, Dontie S. Mitchell ("Plaintiff") commenced

this action in the Northern District of New York on August 7, 2017,

pursuant to 42 U.S.C. § 1983 ("Section 1983"), asserting claims

during his confinement in the custody of the New York State

Department of Corrections and Community Supervision ("DOCCS"). *See*

Complaint ("Compl.") (Docket No. 1). On September 26, 2017, U.S.

District Judge Thomas McAvoy issued a decision and order (Docket No. 13) finding that, *inter alia*, Plaintiff's claims based on constitutional violations that allegedly occurred while he was confined at Elmira Correctional Facility ("C.F."), Wende C.F., and Collins C.F. should be heard in the Western District of New York, where those facilities are located. Accordingly, Judge McAvoy ordered that all of the above-captioned defendants, who are employees of Elmira C.F., Wende C.F., or Collins C.F., and all claims against these individuals, be severed from the Northern District action and transferred to this District for initial screening and adjudication.

## II. *In Forma Pauperis* Application

Plaintiff has met the statutory requirements of 28 U.S.C. § 1915(a) ("Section 1915"). Therefore, he is granted permission to proceed *in forma pauperis.* Pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(a), the Court now must screen the claims transferred from the Northern District of New York.

## III. Initial Screening Under Section 1915

Section 1915 mandates that the court shall dismiss a complaint in a civil action in which a prisoner seeks redress from a governmental entity, or an officer or employee of a governmental entity, if the Court determines that the action (1) fails to state a claim upon which relief may be granted or (2) seeks monetary relief against a defendant who is immune from such relief. *See*

28 U.S.C. § 1915A(b)(1)-(2). In evaluating a complaint under Section 1915, the court must "accept all of the facts alleged in the complaint as true and draw all inferences in the plaintiff's favor. *Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003) (*per curiam*) (citations omitted). "Specific facts are not necessary," and the plaintiff "need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Erickson v. Pardus,* 551 U.S. 89, 93, (2007) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted).

## IV. Section 1983

"To state a valid claim under 42 U.S.C. § 1983, the plaintiff must allege that the challenged conduct (1) was attributable to a person acting under color of state law, and (2) deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Whalen v. County of Fulton,* 126 F.3d 400, 405 (2d Cir. 1997) (citing *Eagleston v. Guido,* 41 F.3d 865, 875-76 (2d Cir. 1994)). To establish Section 1983 liability against a prison official, a plaintiff must allege that individual's personal involvement in the alleged constitutional violation; it is not enough to assert that the defendant is a link in the prison's chain of command. *McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004). The theory of respondeat

superior is not available in a Section 1983 action. *Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003).

## V.    Summary of Plaintiff's Allegations

In the claims transferred to this district, Plaintiff alleges that he was subjected to various constitutional violations that occurred at Elmira C.F., Wende C.F., and Collins C.F. The Court will discuss the allegations relating to each facility separately below.

### A.    Allegations Relating to Elmira C.F.

In 2016, Plaintiff filed grievances related to prisoner telephone use. Compl. at 8. The facility responded by limiting the time that prisoners could use the telephone and requiring prisoners to present their DOCCS identification to make a call. *Id.* at 9. However, this policy did not apply to the telephones in the gym. *Id.* A few months after Plaintiff filed the grievances, CO Flint delayed opening the gym, which created tension among the inmates. *Id.* Plaintiff filed two grievances complaining about this incident. *Id.* at 9. Consequently, Flint imposed limits on the time inmates could use the gym telephones. *Id.*

CO Flint along with CO Pareso, CO Simpson, and CO Arnot repeatedly told other prisoners that Plaintiff was to blame for the new policy, called Plaintiff a "rat," and suggested that "somebody should shut him up." Compl. at 9-10. When Plaintiff attempted to "call a truce" with the CO Pareso and CO Arnot, "the ringleaders,"

CO Pareso threatened Plaintiff stating, "It's too late for that now. You're gonna get what's coming to you." *Id.* at 10. CO Arnot said, "Get out [of] my face. You're lucky I don't smack the sh-t out of you myself." *Id.*

On March 13, 2017, at approximately 11:00 a.m., Plaintiff was "cut" from behind by an unknown inmate in the I-Block. *See* Compl. at 10. The assailant called Plaintiff a "rat." *Id.* A second inmate ran up and "sucker punched" Plaintiff, causing him to lose consciousness. *Id.* Both inmates fled before Plaintiff could identify them. *Id.* Plaintiff awoke in the facility hospital and was transported by ambulance to an outside hospital's emergency room. *Id.* Plaintiff suffered a skull fracture, a concussion, lacerations, significant and bruising; he still suffers headaches, vertigo, and nausea as a result. *Id.*

Subsequently, Plaintiff received a misbehavior report in which he was charged with fighting, violent conduct, creating a disturbance, and refusing a direct order. Compl. at 10-11. Defendant Deputy Superintendent J. Hughes ("Dep. Supt. Hughes"), who presided over Plaintiff's disciplinary hearing, refused to allow introduction of photographs of his injuries and demonstrated bias against Plaintiff during the hearing. *Id.* at 11. After finding Plaintiff guilty, Dep. Supt. Hughes imposed a penalty of 180 days in keeplock, although one of the prisoners who assaulted Plaintiff received only a 60-day sentence. *Id.* at 10-11. Dep. Supt. Hughes

imposed a disproportionately harsh penalty on Plaintiff in retaliation for him pleading "not guilty." *Id.* at 11.

### B. Allegations Relating to Wende C.F.

On May 23, 2017, while Plaintiff was leaving D-Block at approximately 12:30 p.m., defendant Sergeant Robert ("Sgt. Robert") stopped Plaintiff to ask what he had in his pocket. Compl. at 11. When Plaintiff produced his address book, Sgt. Robert told Plaintiff to throw it out. *Id.* Plaintiff said that he needed the book and attempted to go back to his block to return the book to his cell. *Id.* Sgt. Robert again stopped Plaintiff and directed him to put his hands on the wall. *Id.* Plaintiff complied and Sgt. Robert threw the book on the floor. *Id.* After Plaintiff retrieved his book, he told Sgt. Robert he was new to the facility and unaware of the rules. *Id.* When Plaintiff looked at Sgt. Robert's name tag, Sgt. Robert became angry and yelled at him. *Id.*

Plaintiff ignored Sgt. Robert and walked up the stairs inside D-Block's entry. *Id.* Sgt. Robert then ran up and "viciously punched" Plaintiff on the right side of his head, causing him dizziness and pain. *Id.* Sgt. Robert pushed Plaintiff down the stairs. *Id.* at 12.

Plaintiff then was locked in his cell for 72 hours, at Sgt. Robert's direction, while facility staff investigated him for possessing gang material. Compl. at 12. Plaintiff did not receive

a contraband receipt and nothing was confiscated from his cell. *Id.*

Plaintiff filed a grievance complaining about Sgt. Robert's conduct. Compl. at 12. A few days later, Sgt. Robert "stared menacingly" at Plaintiff. *Id.* Lieutenant Herzick ("Lt. Herzick") investigated one of the grievances but mistakenly perceived the grievance as a threat and "whitewashed" it. *Id.* Plaintiff then filed a grievance related to Lt. Herzick's inadequate investigation of his grievance against Sgt. Robert. *Id.*

As a result of filing these grievances, Plaintiff's cell was repeatedly searched. Compl. at 12-13. He also was subjected to several urine tests, some of which were intentionally conducted during the Muslim holy period of Ramadan, when Plaintiff was fasting. *Id.* Consequently, Plaintiff was forced to break his fast and drink water. *Id.* at 13. During the cell searches, Plaintiff's cell was ransacked, his calculator was destroyed, and items were stolen. *Id.* Plaintiff wrote a grievance complaining about the cell searches. *Id.* at 12-13.

Plaintiff then wrote to defendant Superintendent Eckert ("Supt. Eckert") complaining about his staff's behavior. *Id.* at 13. On June 26, 2017, Supt. Eckert instituted a mail watch on Plaintiff's incoming and outgoing mail. *Id.*

Around the same time, Plaintiff sought permission to assist his step-brother, Robert Moore, an inmate in DOCCS' custody, with

a lawsuit. Compl. at 13. Defendant Dep. Supt. Gabel denied Plaintiff's request, although he routinely grants similar requests from other prisoners. *Id.* Plaintiff filed a grievance complaining about Dep. Supt. Gabel's decision and also sent a letter to Prisoners' Legal Services in Buffalo, a copy of which was sent to Dep. Supt. Gabel. *Id.* Prisoners' Legal Services sent a letter to Supt. Eckert and non-party Maher asking them to investigate Plaintiff's claims of harassment. *Id.* at 14.

On July 13, 2017, a few days after the grievances and letters were forwarded, Plaintiff was handcuffed and escorted, without explanation, to the Special Housing Unit ("SHU"). Compl. at 14.

The day after being brought to the SHU, July 14, 2017, Plaintiff received two Tier III misbehavior reports related to the mail watch. Compl. at 14. The first report was issued by Senior Offender Rehabilitation Coordinator B. Richardson ("SORC Richardson"). *Id.* SORC Richardson was the assistant to defendant Captain Meyers ("Cap't Meyers"). *Id.* SORC Richardson was directed by Cap't Meyers to write a misbehavior report that charged Plaintiff with solicitation, making false statements, and a correspondence violation. *Id.* Specifically, SORC Richardson accused Plaintiff of soliciting Sarah Moore  to "kite a letter" to an inmate and to claim she was his step-mother. *Id.*

Defendant SORC Wilkin issued a misbehavior report charging Plaintiff with unauthorized organizational activity and

correspondence violations. Compl. at 14. SORC Wilkin accused Plaintiff of mailing a letter to an individual who was not an inmate informing him about the purpose, aims, beliefs, and principles of an "unidentified organization." *Id.* Defendant Lt. Sowa erroneously designated these two misbehavior reports as Tier III reports. *Id.* at 15.

On July 17, 2017, Plaintiff received a third misbehavior report from Dep. Supt. Gabel arising from the mail watch. *Id.* The report, also dated July 13, 2017, charged Plaintiff with solicitation and making false statements. *Id.* The target of Plaintiff's alleged solicitation again was Sarah Moore. Id.

As a result of the misbehavior reports, three disciplinary hearings were conducted. Defendant SORC Szableski presided over a hearing and found Plaintiff guilty of violating the prison rule related to unauthorized organizational activity. Compl. at 16. Plaintiff was sentenced to 60 days in SHU, which he alleges was disproportionate to the offense. *Id.*

Defendant Deputy Assistant Superintendent T. Franclemont ("Dep. Asst. Supt. Franclemont") conducted a hearing and found Plaintiff guilty of solicitation and correspondence violations and sentenced him to 90 days in keeplock, which Plaintiff asserts is disproportionally severe sentence. He also asserts he will be forced to serve the sentence in SHU. Compl. at 16.

Defendant Lt. Labedz conducted a hearing found Plaintiff guilty of solicitation and sentenced him to 12 days in keeplock. *Id.* Lt. Labedz knew that the misbehavior report was false but followed DOCCS' unofficial policy that required hearing officers to find prisoners guilty of "something." Compl. at 16. As a result of the disciplinary action, Plaintiff was removed from the Aggression Replacement Training Program ("ART Program"). *Id.* at 17.

On August 1, 2017, seven days after his last hearing was completed, Plaintiff was transferred from SHU at Wende C.F. to SHU at Collins C.F. *Id.*

### C.    Allegations Relating to Collins C.F.

When Plaintiff arrived at Collins C.F., he was placed on a "contraband watch." Compl. at 17. This meant that Plaintiff was left naked for 48 hours in a dirty cell with dried feces and blood on the wall. *Id.* at 18. The lights in the cell were constantly on. Plaintiff was forced to urinate in a container and defecate in a bed pan in the presence of another man. *Id.* Plaintiff was not permitted to shower for five days and had no access to reading material for six days. *Id.* at 23. The SHU cells at Collins C.F. are enclosed with solid doors and the recreation area is small. *Id.* Plaintiff was confined 24 hours each day to his area. *Id.* Plaintiff was not allowed to use headphones, and the SHU officers were not responsive to inmates' requests for assistance. *Id.*

**VI. Analysis**

    **A. The Official Capacity Claims For Money Damages Are Dismissed With Prejudice**

The Eleventh Amendment bars federal courts from exercising subject matter jurisdiction over claims against states absent their consent to such suit or an express statutory waiver of immunity. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 97-98 (1984). The Eleventh Amendment bar extends to agencies and officials sued in their official capacities. *Kentucky v. Graham,* 473 U.S. 159, 166 (1985); *see also Hafer v. Melo,* 502 U.S. 21, 27 (1991) (noting that state officers acting in their official capacities are not "persons" being sued; they assume the identity of the government that employs them). Since none of the Defendants have consented, the Eleventh Amendment, as a matter of law, requires dismissal of Plaintiff's official capacity claims for monetary damages.

    **B. Plaintiff Has Stated an Eighth Amendment Claim for Excessive Use of Force Against Sgt. Robert of Wende C.F.**

The standard for determining whether prison officials have violated the Eighth Amendment by using excessive physical force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992). An Eighth Amendment claim entails both a subjective and an objective component. *Id.* at 8-9. The objective component considers the "seriousness of the

injury," while the subjective component addresses whether the defendant possessed a "wanton" state of mind while engaging in the use of force. *Id.* at 6-7.

The key inquiry into a claim of excessive force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 503 U.S. at 7 (citing *Whitley v. Albers,* 475 U.S. 312, 321-22 (1986)); *see also Wilkins v. Gaddy,* 559 U.S. 34, 37 (2010) (*per curiam*) (emphasizing that "the nature of the force applied is the core judicial inquiry in excessive force cases—not whether a certain quantum of injury was sustained").

The Court finds that the complaint has sufficiently alleged an excessive force claim against Sgt. Robert of Wende C.F., who is accused of "viciously" punching Plaintiff in the head without provocation on May 23, 2017, while Plaintiff was leaving D-Block.

**C.    Plaintiff Has Stated Eighth Amendment Claims for Failure to Protect Against CO Flint, CO Pareso, CO Simpson, and CO Arnot of Elmira C.F.**

The Eighth Amendment also requires prison officials to take reasonable measures to guarantee the safety of inmates in their custody. *Hayes v. N.Y. City Dep't of Corr.,* 84 F.3d 614, 620 (2d Cir. 1996) (citing *Farmer v. Brennan,* 511 U.S. 825, 833 (1994)). Prison officials will be liable for harm sustained by an inmate if the officials acted with "deliberate indifference" to the inmate's safety. *Id.*  To state a cognizable Section 1983 claim

based on the failure to protect, the inmate must "allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice." *Id.*

To establish liability under a failure to intervene theory, a plaintiff must prove the use of excessive force by someone other than the individual and that the defendant under consideration (I) possessed actual knowledge of the use by another of excessive force; (ii) had a realistic opportunity to intervene and prevent the harm from occurring; and (iii) nonetheless disregarded that risk by intentionally refusing or failing to take reasonable measures to end the use of excessive force. *Curley v. Vill. of Suffern*, 268 F.3d 65, 72 (2d Cir. 2001).

The Court finds that the complaint has sufficiently alleged Eighth Amendment failure to protect claims against Elmira C.F. employees CO Pareso, CO Arnot, CO Flint, and CO Simpson, whom Plaintiff accuses of inciting other inmates to commit violence against him.

### D. Plaintiff Has Not Stated Eighth Amendment Conditions of Confinement Claims

The question of "whether incarceration in the SHU violates the Eighth Amendment . . . depends on the duration and conditions of the confinement." *Gonzalez v. Hasty,* 802 F.3d 212, 224 (2d Cir. 2015). To establish an Eighth Amendment violation, an inmate must show "(1) a deprivation that is 'objectively, sufficiently serious' that he was denied 'the minimal civilized measure of life's

necessities', and (2) a 'sufficiently culpable state of mind' on the part of the defendant official such as deliberate indifference to inmate health or safety." *Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) (quoting *Farmer*, 511 U.S. at 834).

Plaintiff alleges that his confinement in the SHU at Wende C.F. caused him to feel "trapped and helpless," as if he "were buried alive . . . in a coffin," which caused him to experience "intense anxiety attacks" every night. Compl. at 22. The SHU cells at Wende C.F. were hot. The inmates there yelled and "banged" on the cells and threw feces at other prisoners. *Id.* at 22-23. As a consequence of his SHU confinement at Wende C.F., Plaintiff experienced a "deep depression" and contemplated suicide. *Id.* at 22-23.

When Plaintiff was placed on a 48-hour contraband watch in Collins C.F.'s SHU, he was required to wear only a paper gown and slippers, and placed in a "filthy" cell "with dried feces and blood smeared on the walls." *Id.* at 23. Also, he was not able to shower for five days. *Id.*

While confinements for less than 101 days "under normal SHU conditions may not implicate a prisoner's liberty interest," such confinements "could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions of *Sealy* or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in

fact, atypical." *Palmer*, 364 F.3d at 65. While Plaintiff has set forth allegations concerning the conditions of his SHU confinements at Wende C.F. and at Collins C.F., the duration of his confinements are unclear. In addition, Plaintiff has not set forth any allegations regarding which defendants were personally involved in the conditions of confinement claims, or any allegations regarding these putative defendants' culpable state of mind. Therefore, these claims are dismissed without prejudice for failure to state a claim, with leave to replead.

### E. Plaintiff Has Stated First Amendment Retaliation Claims Against Multiple Defendants

The First Amendment protects an inmate from retaliation for engaging in protected speech, including filing grievances related to prison conditions. *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir. 1996). In order to assert a retaliation claim, a prisoner must show that "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (internal quotation marks omitted). In the prison context, the Second Circuit has defined "adverse action" objectively, as retaliatory conduct "that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir. 2003), *superseded by* 320 F.3d 346, 2003 WL 360053 (2d Cir. Feb. 10,

2003). "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Gill*, 389 F.3d at 381. "[A] plaintiff asserting First Amendment retaliation must allege some sort of harm," but harm need not, "in all cases, be a chilling of speech." *Id.* at 383. Plaintiff has set forth sufficient allegations to set forth the requisite elements (protected conduct, adverse action, and causal connection) of a plausible retaliation claim against the following Defendants:

- CO Flint, CO Pareso, CO Arnot, and CO Simpson, in retaliation for Plaintiff's filing of grievances regarding inmate telephone use, incited other inmates to commit violence against him, and other inmates did commit violence against Plaintiff on March 13, 2017. *See* Compl. at 9-10.

- Dep. Supt. Hughes, who conducted the disciplinary hearing on the March 13, 2017 misbehavior report, based on the incident in which Plaintiff was ambushed and "cut" and "sucker punched" by two inmates, retaliated against him for pleading "not guilty" to the misbehavior report by (a) denying him the ability to present evidence, (b) demonstrating bias against him, and (c) imposing a lengthier sentence on him than one of his assailants. Compl. at 10-11.

- Sgt. Robert and Lt. Herzick, in retaliation for the grievance Plaintiff filed about Sgt. Robert's conduct towards him, and assault of him, and in retaliation for the grievance filed about Lt. Herzick's inadequate investigation into the grievance about Sgt. Robert, caused Plaintiff to be subjected to repeated cell searches, as well as several urine tests during Ramadan, which interfered with his ability to observe that holy period.

- Supt. Eckert, in retaliation for Plaintiff's filing of grievances against Eckert's staff (Sgt. Robert and Lt. Herzick), imposed a mail watch on Plaintiff's correspondence.

- Dep. Supt. Gabel denied Plaintiff's request to assist his step-brother, also an inmate, with a lawsuit. Plaintiff filed a grievance about this. In retaliation, Dep. Supt. Gabel caused him to be placed in SHU and to be issued two misbehavior reports based on alleged violations of the mail watch.

- Capt. Meyers, SORC Richardson, and SORC Wilkin, in retaliation for Plaintiff's sending of letters of complaint to Supt. Eckert and Prisoners' Legal Services about staff misconduct, issued misbehavior reports against Plaintiff.

- Lt. Sowa, in retaliation for Plaintiff's sending of letters of complaint to Supt. Eckert and Prisoners' Legal Services about staff misconduct, erroneously characterized the retaliatory misbehavior reports issued by Capt. Meyers, SORC Richardson, and SORC Wilkin, as Tier III infractions, which allow imposition of the most severe punishments.

- SORC Szableski and Franclemont imposed grossly disproportionate sentences for their guilty findings on Plaintiff's mail infractions, in retaliation for his filing of grievances.

- Lt. Labedz knew the misbehavior report on which he held a hearing was false, but found Plaintiff guilty anyway in retaliation for his filing of grievances; because of the guilty finding, Plaintiff lost his ability to participate in the ART program.

Discovery may reveal that the foregoing Defendants' actions were not retaliatory. However, at this stage of the litigation, it is incumbent upon the Court to construe the *pro se* complaint's

allegations liberally in Plaintiff's favor. *Vega*, 610 F. Supp.2d at 207.

### F. Plaintiff Has Not Stated Fourteenth Amendment Due Process Claims Against SORC Szableski, Franclemont, and Lt. Labedz, and Dep. Supt. Hughes

To state a claim for procedural due process violations, the inmates must allege that he "(1) . . . had a protected liberty interest in not being confined . . . and . . . (2) [that] . . . the deprivation of that liberty interest occurred without due process of law.'" *Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir. 1997) (quotation omitted). Following Supreme Court's decision in *Sandin v. Conner*, 515 U.S. 472 (1995), "whether the plaintiff had a protected liberty interest in not being confined" also requires a two-part analysis. *Frazier v. Coughlin*, 81 F.3d 313, 317 (2d Cir. 1996) (*per curiam*). According to *Sandin*, "a prisoner has a liberty interest only if the deprivation . . . is atypical and significant and the state has created the liberty interest by statute or regulation." *Sealey*, 116 F.3d at 52. The duration of a disciplinary confinement remains pertinent to *Sandin*'s atypicality inquiry, but it is not the only factor to be considered. *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000).

With regard to SORC Szableski and Franclemont, the Court will analyze the second prong first. Plaintiff has not alleged any procedural due process violations occurred at the hearings held by

these Defendants. Therefore, Plaintiff has failed to state plausible due process claims against SORC Szableski and Franclemont. In addition, the SHU confinements imposed by these defendants (60 days and 90 days, respectively) have not been held to implicate cognizable liberty interests, as long as the SHU conditions are "normal." *See Colon*, 215 F.3d at 231 ("The longest confinement in normal SHU conditions that we have ruled was not shown to meet the *Sandin* standard was 101 days.") (citation omitted). These claims will be dismissed without prejudice with leave to replead the first and second elements.

Turning to Lt. Labedz, Plaintiff alleges that he was found guilty based on an underlying misbehavior known to Lt. Labedz to be false. Compl. ¶ 87. However, "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir. 1997) (citation omitted). Plaintiff has not alleged that any procedural due process violations occurred at the hearing held by Lt. Labedz. Furthermore, the confinement imposed—12 days in keeplock—does not implicate a liberty interest. *See, e.g., Odom v. Keane*, No. 94 Civ. 8032, 1997 WL 3262, at *1 (S.D.N.Y. Jan. 6, 1997) (46 days in keeplock did not implicate liberty interest). The Court notes that Plaintiff alleges that he had to serve the keeplock sentence in SHU. However, even if it was served in SHU, a sentence of similar length in SHU has been found not to implicate

a liberty interest. *See Quartararo v. Catterson,* 917 F. Supp. 919, 937-38 (E.D.N.Y.1996) (14days' SHU confinement did not impose atypical and significant hardship on prisoner). This claim will be dismissed with prejudice, without leave to replead.

Finally, with regard to Dep. Supt. Hughes, Plaintiff alleges that she committed a due process error at the hearing itself, by precluding photographs of Plaintiff's injuries and demonstrating lack of partiality. Dep. Supt. Hughes imposed a penalty of 180 days in keeplock, i.e., administrative segregation. *See Sullivan v. Schweikhard*, 968 F. Supp. 910, 912 (S.D.N.Y. 1997). "Confinement in keeplock is a known and usual aspect of the New York prison system and standing alone cannot satisfy *Sandin*'s 'atypical' test." *Id.* at 913-14 (citation omitted). Plaintiff has not alleged any facts suggesting that the conditions of keeplock were "atypical." This claim will be dismissed without prejudice, with leave to replead the second element.

> **G.  Plaintiff Has Alleged Personal Involvement by Supt. Chappius and Supt. Eckert in the Claims of Systemic Abuses Within DOCCS**

A supervisory prison official can be found to be personally involved in an alleged constitutional violation if "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional

practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995) (citing *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir. 1994)).

In the section of the complaint regarding the systemic constitutional violations throughout DOCCS, *see* Compl. at 23-26, Supt. Chappius and Supt. Eckert are accused of allowing a policy widespread inmate abuse by facility staff. *Id.* ¶ 134. An inmate may successfully make out an Eighth Amendment violation against a supervisory official if he is able to show "a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant official being sued had been exposed to information concerning the risk and thus must have known about it. . . ." *Farmer v. Brennan,* 511 U.S. 825, 842–43 (1994). The Court finds that Plaintiff's allegations of deliberate indifference by Supt. Chappius and Supt. Eckert to "a pattern and practice of staff brutality towards inmates" withstands initial screening. *See Cruz v. New York,* 24 F. Supp. 3d 299, 307, 309 (W.D.N.Y. 2014) (declining to dismiss similar claim on motion to dismiss based on inmate's allegations that defendants' conduct was

a "substantial factor" in the continuation of violence by correction officers; and that the supervisory defendants permitted, tolerated, and sanctioned the "persistent and widespread policy" of abuse of prisoners; inmate sufficiently alleged personal involvement under *Colon*).

### H.  Conspiracy

To state a conspiracy claim under Section 1983, a plaintiff must allege the existence of "(1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir. 1999) (citations omitted). Here, all of the Defendants were DOCCSS employees during the relevant period and all were acting within the scope of their employment. "Generally, th[e] [intracorporate conspiracy] doctrine provides that officers, agents or employees of a single corporate entity are legally incapable of conspiring together." *Vega v. Artus*, 610 F. Supp.2d 185, 205 (N.D.N.Y. 2009) (citation omitted). Thus, district courts in this Circuit consistently have found that conspiracy claims "to retaliate or discriminate against an inmate, motivated by personal bias alone, cannot overcome the intracorporate conspiracy doctrine when asserted against employees of a single entity." *Povoski v. Lacy,* No. 9:14-CV-97 (BKS/CFH), 2016 WL 908899, at *7 (N.D.N.Y. Feb. 8, 2016) (citation omitted),

*R&R adopted*, No. 914CV0097BKSCFH, 2016 WL 913254 (N.D.N.Y. Mar. 9, 2016). There is, however, a "scope of employment" exception applicable to employees "pursuing personal interests wholly separate and apart from the entity by whom they were employed." *Vega*, 610 F. Supp.2d at 205-06.

Here, the Court finds that Plaintiff has plausibly asserted that the alleged conspirators' personal interests were more than simply personal biases against him. Plaintiff alleges that Dep. Supt. Kevin Brown, Dep. Supt. Gabel, and Capt. Meyers were at the top of the conspiracy and, "with the blessing and approval of [Superintendent] Eckert," "work[ed] in concert" to "orchestrate[] the retaliatory hit" on Plaintiff. Compl. ¶ 89. Plaintiff further alleges that SORC Wilkins, SORC Richardson, SORC Szableski, Franclemont and Lt. Labedz were the foot-soldiers of the conspiracy who were "under orders" to retaliate against Plaintiff "with the aim to silence and get rid of him." *Id.* ¶ 88. Liberally construed, these allegations suggest that Defendants were acting in their own self-interests, to prevent the exposure of the "invalid, illegal, abusive, unprofessional, and unconstitutional actions of their coworkers," *Id.* ¶ 88, and thereby shield themselves from being investigated and disciplined. Therefore, the Court finds that Plaintiff has sufficiently pleaded allegations that, on initial screening, plausibly place his claim within the scope of employment exception to the intra-corporate conspiracy doctrine.

As with the retaliation claims, discovery may reveal that the foregoing Defendants' actions were not conspiratorial. However, at this stage of the litigation, and without a more complete record, it is incumbent upon the Court to construe the *pro se* complaint's allegations liberally in Plaintiff's favor. *Vega*, 610 F. Supp.2d at 207.

## VII. Conclusion

Wherefore, it is hereby

**ORDERED** that Plaintiff's request to proceed *in forma pauperis* (Docket No. 2) is **granted.** It is further

**ORDERED** that Plaintiff's motion to stay (Docket No. 16) is **denied as moot.** It is further

**ORDERED** that the following claims are sufficient to survive initial review and proceed to service:

• the excessive force claim against Sgt. Robert. *See* Section VI.B, *supra*.

• the failure-to-protect claims against CO Pareso, CO Arnot, CO Flint, and CO Simpson. *See* Section VI.C, *supra*.

• the First Amendment retaliation claims against defendants CO Pareso, CO Arnot, CO Flint, CO Simpson, Sgt. Robert, Supt. Eckert, Dep. Supt. Gabel, Dep. Supt. Hughes, Lt. Labedz, Lt. Sowa, Lt. Herzick, SORC Richardson, SORC Wilkin, SORC Szableski, and Asst. Dep. Supt. Franclemont. *See* Section VI.E, *supra*.

- the Eighth Amendment conditions of confinement and failure to protect claims against Supt. Eckert and Supt. Chappius. *See* Section VI.G, *supra*.

- the conspiracy claims against Dep. Supt. Kevin Brown, Dep. Supt. Gabel, Capt. Meyers, SORC Wilkins, SORC Richardson, SORC Szableski, Asst. Dep. Supt. Franclemont and Lt. Labedz. *See* Section VI.H, *supra*.

It is further

**ORDERED** that the following claims are dismissed without prejudice with leave to replead:

- the Eighth Amendment conditions of confinement claims. *See* Section VI.D, *supra*.

- the Fourteenth Amendment Due Process claims against Dep. Supt. Huges, SORC Szableski, and Asst. Dep. Supt. Franclemont. *See* Section VI.F, *supra*.

It is further

**ORDERED** that the Fourteenth Amendment Due Process claim against Lt. Labedz is dismissed with prejudice without leave to replead. *See* Section VI.F, *supra*. It is further

**ORDERED** that the official capacity claims for monetary damages against all Defendants are dismissed with prejudice without leave to replead. *See* Section VI.A, *supra*. It is further

**ORDERED** that as to the claims that are dismissed without prejudice with leave to replead, if Plaintiff wishes to pursue

these claims, he **must file an amended complaint within <u>45 days</u> of the entry of this Decision and Order** in a manner that complies with Rules 8 and 10 of the Federal Rules of Civil Procedure. Plaintiff is advised that **an amended complaint will completely replace the prior complaint** in the action, and thus it "renders [any prior complaint] of no legal effect." *Int'l Controls Corp. v. Vesco,* 556 F.2d 665, 668 (2d Cir. 1977). Therefore, an amended complaint must include all of the allegations against each Defendant so it may stand alone as the sole complaint that the Defendants must answer. It is further

**ORDERED** that the Clerk of Court is directed to send to Plaintiff, along with a copy of this decision and order, a copy of the original complaint, a blank Section 1983 complaint form, and the instructions for preparing an amended complaint. It is further

**ORDERED** that, in the event Plaintiff fails to file an amended complaint in the manner directed above, the Clerk of Court shall cause the United States Marshals Service to serve the summons and complaint on the Defendants named in the caption, without Plaintiff's payment therefor, unpaid fees to be recoverable if this action terminates by monetary award in Plaintiff's favor. It is further

**ORDERED** the Clerk of Court shall forward a copy of this decision and order by email to Ted O'Brien, Esq., Assistant Attorney General in Charge, Rochester Regional Office of the New

York State Attorney General's Office, at <Ted.O'Brien@ag.ny.gov>.
It is further

   **ORDERED** that pursuant to 42 U.S.C. § 1997e(g)(2), Defendants
are directed to respond to the complaint upon service.

   **ALL OF THE ABOVE IS SO ORDERED.**

                                 S/Michael A. Telesca

                          _____
                                 HON. MICHAEL A. TELESCA
                              United States District Judge

Dated:     August 27, 2018
           Rochester, New York.